Golobe v Mielnicki (2025 NY Slip Op 01670)

Golobe v Mielnicki

2025 NY Slip Op 01670

Decided on March 20, 2025

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on March 20, 2025

No. 17 

[*1]John Golobe, Respondent,
v
Daniel Mielnicki, & c., Appellant.

Leslie D. Corwin, for appellant. 
John M. Brickman, for respondent. 

WILSON, Chief Judge:

Dorothy Golobe died in 1992. Her estate included a three-story building at 265 West 30th St, New York ("the Premises"). Dorothy's nephew, John Golobe ("Mr. Golobe"), became the estate's administrator [FN1]. He informed Surrogate's Court that his father, Dorothy's brother Zangwill Golobe, was Dorothy's only surviving heir. An attorney and friend who had known the family for decades testified that Dorothy's other brother, Yale Golobe, had predeceased her by six or seven years. Surrogate's Court found that Zangwill was Dorothy's sole distributee, and Zangwill renounced his interest in favor of Mr. Golobe. Mr. Golobe has possessed and maintained the property ever since. So far, so good.
But there's a twist: when Dorothy died, Yale was still alive. He therefore should have inherited a one-half interest in Dorothy's estate, including the Premises. The parties agree that until 2018, Mr. Golobe did not know that Yale had survived Dorothy. After discovering the error, Mr. Golobe brought this action claiming that he had acquired sole ownership of the Premises through adverse possession. Yale's successor—the Emil Kraus Revocable Trust—counterclaimed for fraud and breach of fiduciary duty based on Mr. Golobe's conduct as administrator of Dorothy's estate.
We now hold that Mr. Golobe is the sole owner of the Premises through adverse possession and affirm the dismissal of the Trust's counterclaims.
I.
Dorothy Golobe died intestate in February 1992, at age 85. She was survived by her two brothers, Yale Golobe and Zangwill Golobe. Under New York law, Yale and Zangwill each were entitled to inherit a one-half interest in Dorothy's estate, which included the Premises.
Mr. Golobe, the plaintiff in this case, is Zangwill's son. At the time of Dorothy's death, Mr. Golobe believed (incorrectly) that his uncle Yale had predeceased Dorothy. Mr. Golobe petitioned Surrogate's Court to become the administrator of Dorothy's estate, and advised the court that his father, Zangwill, was her sole distributee. Mr. Golobe's personal belief that Yale was dead was supported by the fact that Yale was 11 years older than Dorothy, who was in her mid-80s when she died.
Mr. Golobe provided Surrogate's Court with a family tree chart completed and signed by Harold Kozupsky, an attorney and friend of the family. On the chart, Harold Kozupsky wrote that Yale had died in June 1985. As the basis for his knowledge, he explained: "I am a friend of the family. I have known decedent's sole distribute, Zangwill Golobe, for over 30 years and thus I am familiar with his family." At a hearing held in Surrogate's Court, Mr. Kozupsky testified that Yale had predeceased Dorothy by six or seven years. Surrogate's Court granted Mr. Golobe's petition to become administrator of Dorothy's estate and determined that Zangwill Golobe was Dorothy's sole distributee.
Harold Kozupsky's son, Roy Kozupsky, represented Mr. Golobe in the Surrogate's Court proceedings. In 2021, Roy Kozupsky testified that when he was involved with the administration of an estate, his "normal" practice was to "check probate files, death certificates, yellow pages, Social Security; if it warranted and the client could pay for it, an heirship search, if the court required it." He could not recall whether he had done so in this case.
In September 1992, Zangwill renounced his interest in Dorothy's estate in favor of his son, Mr. Golobe. Mr. Golobe took possession of the Premises in October 1992 and has maintained possession since then. He has negotiated leases, collected and retained rent, paid property taxes, executed a construction mortgage, and made substantial renovations to the Premises. Those renovations include a complete structural support overhaul, an interior gut renovation, the replacement of the front entrance and door, the replacement of the second and third floor windows, and the replacement of the roof.
Yale actually died the year after Dorothy, in 1993. His estate passed to his wife Helen, then to Helen's sister Beatrice, then to Beatrice's husband Emil Kraus. Upon Mr. Kraus's death, his estate passed to the Trust, the defendant-appellant in this case.
By 2018, Mr. Golobe was still unaware that Yale had survived Dorothy. That year, he attempted to sell the Premises. A title search revealed that Yale had survived Dorothy, and that Mr. Golobe had been entitled to inherit only a one-half interest in the Premises. In March 2019, Kevin Farrelly, Mr. Golobe's then-attorney, contacted Ira Altchek, then the trustee of the Trust, to advise him of the Trust's potential interest in the Premises. In January 2020, Mr. Farrelly told Mr. Altchek that he was preparing an accounting of the Premises, asked him to sign a listing agreement allowing John's chosen real estate agent to continue marketing the property, and noted that the parties would have to determine how to share the proceeds of the sale.
In September 2020, Mr. Golobe retained new counsel. His new attorney brought this action seeking a declaration that Mr. Golobe had become the sole owner of the Premises through adverse possession. The Trust opposed and counterclaimed for fraud and breach of fiduciary duty on Mr. Golobe's part. Both parties moved for summary judgment.
Supreme Court granted Mr. Golobe's motion for summary judgment and denied the Trust's motion. The court declared Mr. Golobe the sole owner of the Premises and dismissed the Trust's claims for fraud and breach of fiduciary duty. The Appellate Division affirmed, holding that Mr. Golobe had established his sole ownership of the Premises through adverse possession. The court also affirmed the dismissal of the Trust's counterclaims, holding that the Trust "failed to establish plaintiff's scienter as to any misstatement or defendant's own reliance on any misstatement made to . . . Surrogate's Court" on the fraud counterclaim, and failed to show that plaintiff had a fiduciary duty, as administrator of the estate, to "conduct an extraordinary search to confirm the death of a potential distributee." We affirm.
[*2]II.
We begin with the fraud claim. As the Appellate Division explained, there is no triable issue of fact on either the scienter or reliance elements of fraud. The fraud claim was properly dismissed.
To succeed on a motion for summary judgment, the proponent of the motion must "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Jacobsen v New York City Health and Hosps. Corp., 22 NY3d 824, 833 [2014], quoting Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). In determining whether the movant has done so, we view the facts in the light most favorable to the nonmoving party (id.). If the proponent of the motion makes a prima facie showing, the burden "shifts to the non-moving party to 'establish the existence of material issues of fact which require a trial of the action' " (id., quoting Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). Here, we view the evidence in the light most favorable to the nonmoving party, the Trust.
There are five elements of fraud: (1) "a misrepresentation or a material omission of fact" (Pasternack v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 827 [2016]), (2) "which is either untrue and known to be untrue or recklessly made" (Jo Ann Homes at Bellmore, Inc. v Dworetz, 25 NY2d 112, 119 [1969]), (3) "made for the purpose of inducing the other party to rely upon it," (4) "justifiable reliance of the other party on the misrepresentation or material omission," and (5) injury (Pasternack, 27 NY3d at 827). Indirect communication can establish a fraud claim if "the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it" (id. at 828).
Summary judgment is warranted because there is no triable issue of fact as to either scienter or reliance. The parties agree that Mr. Golobe did not know of the Trust's interest until 2018, at the earliest. He could not, therefore, have intended the Trust or its predecessors to rely on any statement or omission he made. The Trust and its predecessors were equally in the dark, and there is no evidence that they relied on any statement or omission made by Mr. Golobe. Although the dissent is written to imply that Mr. Golobe acted fraudulently, the dissent agrees that the Trust has not established fraud.
III.
We also agree that the Trust's claim for breach of fiduciary duty was properly dismissed. The elements of a breach of fiduciary duty are "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct" (Village of Kiryas Joel v County of Orange, 144 AD3d 895, 898 [2d Dept 2016], quoting Varveris v Zacharakos, 110 AD3d 1059, 1059 [2013]). A fiduciary duty exists here: administrators owe fiduciary duties to the estate and its beneficiaries (Matter of Jones, 8 NY2d 24, 28 [1960]). The question is whether Mr. Golobe's efforts to identify the beneficiaries of Dorothy's estate fell short of his fiduciary duty, thus constituting misconduct.
An administrator must make reasonable efforts to identify the decedent's heirs. The duty to conduct a reasonable search flows from the fiduciary duty administrators owe to the estate and its beneficiaries (cf. Jones, 8 NY2d at 28).
Here, we view the facts in the light most favorable to the Trust and assume that Mr. Golobe's search was limited to relying on Harold Kozupsky's testimony. Mr. Kozupsky was a disinterested person who provided the basis for his knowledge. Mr. Golobe was therefore entitled to rely on his testimony. The Trust has failed to introduce any evidence suggesting that Mr. Golobe's reliance was unreasonable under the circumstances of this case. In retrospect, it is clear that Mr. Kozupsky was wrong: Yale was not dead. But the reasonableness of a search is not determined by whether it succeeds. The question is whether Mr. Golobe was entitled to rely on the testimony of Harold Kozupsky, or whether he had to do more to confirm that his uncle Yale, who then would have been 96 years old, was dead. We hold that Mr. Golobe fulfilled his fiduciary duty.
The reasonableness of Mr. Golobe's conduct is bolstered by the regulations governing petitions for estate administration [FN2]. As of 1992, when Dorothy Golobe died, the regulations established that when a petitioner "alleges [*3]that the decedent was survived by . . . only one distributee" the petitioner must submit proof (1) of the distributee's relationship to the decedent and (2) "that no other persons of the same or a nearer degree of relationship survived the decedent" (former 22 NYCRR 207.17 [c] [eff. 1986]). Unless otherwise authorized, that proof "must be by an affidavit or testimony of a disinterested person" and "shall include as an exhibit a family tree, table or diagram" (id.). That is the procedure Mr. Kozupsky followed.[FN3]
IV.
Finally, we agree that Mr. Golobe has acquired sole ownership of the Premises through adverse possession. The question—whether a cotenant may adversely possess property when neither cotenant is aware of the existence of the co-tenancy—is an issue of
first impression in New York. We hold that a cotenant may obtain full ownership of jointly owned property even when neither party is aware of the other cotenant's interest. Mr. Golobe did so.
"To establish a claim of adverse possession, the occupation of the property must be (1) hostile and under a claim of right (i.e., a reasonable basis for the belief that the subject property belongs to a particular party), (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous for the statutory period (at least 10 years)" (Estate of Becker v Murtagh, 19 NY3d 75, 81 [2012]). The parties agree that Mr. Golobe actually, exclusively and continuously occupied the Premises for over 20 years, beginning in October 1992. We must determine whether Mr. Golobe's possession was hostile, under a claim of right, and open and notorious. It was all three.
A.
First, Mr. Golobe's possession of the Premises was hostile. In general, the hostility element "is satisfied where an individual asserts a right to the property that is 'adverse to the title owner and also in opposition to the rights of the true owner.' A rebuttable presumption of hostility arises from possession accompanied by the usual acts of ownership" (Becker, 19 NY3d at 81 [citation omitted], quoting Walling v Przybylo, 7 NY3d 228, 232-233 [2006]).
The application of the hostility element to cotenants is governed by RPAPL 541, which modified the common-law rules of adverse possession by cotenants. Hostility is complicated in a co-tenancy because "each cotenant has an equal right to possess and enjoy all or any portion of the property as if the sole owner" (Myers v Bartholomew, 91 NY2d 630, 632-633 [1998]). There is therefore a common-law presumption that "a cotenant's possession is possession by and for the benefit of all other cotenants" (id.). Before the passage of RPAPL 541, a cotenant seeking to defeat the presumption of nonadverse possession was required to show either actual ouster, which "requires a possessing cotenant to expressly communicate an intention to exclude or to deny the rights of cotenants," or implied ouster, which occurs "where the acts of the possessing cotenant are so openly hostile that the nonpossessing cotenants can be presumed to know that the property is being adversely possessed against them" (id. at 633). Determining when there had been implied ouster was a "vexing" and fact-intensive task (id.).
To resolve the "uncertainty of title plaguing possessory tenants-in-common who had adversely possessed for many years," the legislature enacted Civil Practice Act § 41-a, later codified as RPAPL 541 (Myers, 91 NY2d at 635)[FN4]. That provision establishes that the presumption of nonadverse possession "shall cease after the expiration of ten years of continuous exclusive occupancy by [a] tenant . . . or immediately upon an ouster by one tenant of the other and such occupying tenant may then commence to hold adversely to his cotenant" (RPAPL 541). We have explained that RPAPL 541 recognizes "another means, in addition to ouster, for terminating the presumption": 10 [*4]years of continuous and exclusive occupation of the property (Myers, 91 NY2d at 636)[FN5]. After RPAPL 541's 10-year period expires, a cotenant "may begin to hold adversely" (id. at 634-635).
That brings us to the question at issue here: what does it look like for a cotenant to "hold adversely" after the 10-year presumption expires, and is it possible for a cotenant to do so when neither party is aware that the co-tenancy exists? We hold that a cotenant's possession may be hostile even where neither tenant is aware of the existence of the co-tenancy. After RPAPL 541's 10-year period ends, the presumption of nonadverse possession ceases and the hostility element applies in the same way to cotenants as it does to other adverse possessors (see Becker, 19 NY3d at 81-81 ["A rebuttable presumption of hostility arises from possession accompanied by the usual acts of ownership, and this presumption continues until the possession is shown to be subservient to the title of another"]).[FN6]
Outside the context of co-tenancy, we have held that mutual mistake does not defeat hostility. In Becker, both parties believed that the property at issue—a dock and boardwalk—belonged to the adverse possessor (19 NY3d at 82-83). Nevertheless, we held that the adverse possessor's claim was hostile to the true owner's because a "mutual mistake" as to ownership "does not negate the hostility element" (id.; see also Hindley v Manhattan Ry. Co., 185 NY 335, 357 [1906]). Here, Mr. Golobe and the Trust were mutually mistaken as to the true ownership of the Premises. That does not negate Mr. Golobe's hostile possession.
That this mutual mistake occurred in the context of co-tenancy does not change the result. Once RPAPL's 10-year period has ended, the hostility element operates the same way for cotenants as it does for other adverse possessors. Here, Mr. Golobe fulfilled the requirements of RPAPL 541 by possessing the Premises continuously and exclusively for more than 20 years. From 1992 to 2002, Mr. Golobe could not adversely possess the Premises absent ouster. In 2002, however, the presumption of nonadverse possession ended. From then on, Mr. Golobe exercised "the usual acts of ownership" by signing leases, collecting and keeping rent, and conducting large-scale renovations. Those acts of ownership gave rise to a rebuttable presumption of hostility which the Trust has not provided any evidence to rebut (cf. Becker, 19 NY3d at 82 ["(H)ostility is negated by '(s)eeking permission for use from the record owner' " (quoting City of Tonawanda v Ellicott Cr. Homeowners Assn., 86 AD2d 118, 124 [4th Dept 1982])]).
Mr. Golobe's one-time recognition of the Trust's interest does not negate the hostility of his possession. Hostility is established by the assertion of a right to the property that is "adverse to the title owner," not by "enmity or specific acts of hostility" (Becker, 19 NY3d at 81). Our decision in Van Valkenburgh v Lutz, which established that prior judgments involving the claimant may be used as evidence of the claimant's recognition of the true owner's title, is distinguishable (304 NY 95 [1952]). There, the claimant conceded in an earlier court proceeding that the defendant had title to the property at issue (id. at 99). He made that concession "in order to provide a basis for establishing [his] right to an easement by adverse possession" (id.). We held that "having succeeded in establishing his claim of easement by adverse possession, [the claimant] may not now disavow the effect of his favorable judgment or prevent its use as evidence to show his prior intent" (id. at 100 [citation omitted]). Mr. Golobe has never conceded the Trust's continued ownership in a court of law, nor has he obtained a judgment that the Trust continues to have an interest in the Premises. The letter Mr. Golobe sent to the Trust, suggesting the possibility of a settlement [*5]if the Trust assented to sale of the Premises in the manner specified by Mr. Golobe, does not have the same effect as the judgment in Lutz.
In reaching our holding, we are mindful of the importance of ensuring the alienability of real property without infringing too far on the rights of unsuspecting property owners. Although "the acquisition of title by adverse possession is not favored under the law" (Becker, 19 NY3d at 81), adverse possession is "a necessary means of clearing disputed titles" and ensuring that title is not permanently encumbered (Belotti v Bickhardt, 228 NY 296, 308 [1920]; see also Brand v Prince, 35 NY2d 634, 636 [1974]). To protect the original owner's rights, the ordinary requirements of adverse possession were designed to ensure that the party whose interest might be extinguished had " 'notice of the hostile claim and be thereby called upon to assert his [or her] legal title' " (Hinkley v State, 234 NY 309, 317 [1922], quoting Monnot v Murphy, 207 NY 240, 245 [1913]). But as the dissent concedes, notice need not be actual (dissenting op at 9; see Culver v Rhodes, 87 NY 348, 348 [1882]). Allowing adverse possession only where the true owner had actual notice of its interest would undermine adverse possession's important policy of repose.
The dissent's proposed rule would protect true owners only in an extremely limited subset of cases, where an error remained undiscovered for more than 20 years and "cotenants in common are unaware of their respective inheritance interests, and the reason for that mistake is the adverse claimant's failure to perform the requisite diligent search to confirm the status of an apparent distributee" (dissenting op at 3). Any apparent unfairness of the outcome in a case where a cotenant did not become aware of its interest is mitigated by the extended 20-year period and the statutory requirement that a reasonable basis existed for an adverse possessor's belief of ownership.
B.
Next, Mr. Golobe's possession was under a claim of right. Surrogate's Court's found that Mr. Golobe's father was the sole distributee of Dorothy's estate, entitling Mr. Golobe to full ownership of the Premises once his father disclaimed. In October 1992, Mr. Golobe became the record owner of the Premises by Administrator's Deed. Mr. Golobe thus had a reasonable basis for believing that he owned the Premises (see RPAPL 501 [3]).[FN7]
C.
Finally, Mr. Golobe's possession was open and notorious. The requirements for open and notorious possession depend on the character of the property (see Ray v Beacon Hudson Mountain Corp., 88 NY2d 154, 160 [1996]). Possession is open and notorious if it is "sufficiently visible such that a casual inspection by the owner of the property would reveal the adverse possessor's occupation and use thereof" (Rote v Gibbs, 195 AD3d 1521, 1525 [4th Dept 2021], quoting Weinstein Enters. v Pesso, 231 AD2d 516, 517 [2d Dept 1996]). Here, casual inspection would have revealed, at the very least, that Mr. Golobe had conducted large-scale renovations of the property. His possession was therefore open and notorious (see Ray, 88 NY2d at 160 ["By their nature, regular cultivation, improvement and inclosure of another's land constitute open and notorious acts of possession"]).
The Trust argues that the open and notorious requirement should operate differently for cotenants because of the presumption that a cotenant's possession is for the benefit of all cotenants. As we have explained, that presumption ceases after the 10-year period set out in RPAPL 541 (Myers, 91 NY2d at 636). The Trust effectively asks us to import the common law ouster requirement into the open and notorious element of adverse possession. Doing so is inconsistent with RPAPL 541, which allows cotenants to possess adversely absent ouster provided they continuously and exclusively possess the property for 20 years.
V.
Mr. Golobe continuously and exclusively possessed the Premises for over 20 years. As the sole possessor, he exercised the usual incidents of ownership, conducting large-scale renovations, executing a mortgage, and collecting and keeping rents. From 1992 to 2002, the presumption of nonadverse possession applied and Mr. Golobe's possession was not hostile. But in 2002, the presumption expired and—in the absence of anything to rebut the presumption of hostility—Mr. Golobe began to possess adversely. In 2012, Mr. Golobe acquired sole ownership.
The Trust's counterclaims were properly dismissed. There is no evidence that Mr. Golobe, who believed his long-lost uncle had died, committed fraud or breached any fiduciary duty to the estate or its beneficiaries.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

RIVERA, J. (dissenting):

This appeal centers on a mistake of fact dating back to 1992, when Dorothy Golobe died intestate and her nephew, plaintiff John Golobe, failed to act diligently to confirm whether his father was the sole surviving heir. A month after Dorothy's death, plaintiff represented to Surrogate's Court that his father, Zangwill, was Dorothy's brother and the sole surviving distributee, and thus entitled to the entire estate. In fact, Dorothy was also survived by her other brother, Yale. According to plaintiff, at the time he made this representation to the court, the basis for his belief that Yale predeceased Dorothy was threefold: (1) plaintiff and some unnamed members of the "family" had not heard from Yale in several years; (2) a family friend of 30 years believed Yale had died about six years before Dorothy, even though the friend failed to explain the basis for that belief; and (3) because Yale was approximately ten years older than Dorothy, who died at 85 years of age, plaintiff assumed that Yale died before her. Plaintiff also misrepresented the net worth of Dorothy's estate to Surrogate's Court for months, until after he personally acquired full interest in the estate, even though at all relevant times he was aware of her real property holdings.
Plaintiff's submissions containing his representations were inadequate under the Surrogate's Court Procedure Act and the Uniform Rules for Surrogate's Court, which required that he undertake a diligent search to discover evidence of Yale's death and that he provide a complete inventory and valuation of the estate (SCPA 2225; Uniform Rules for Surrogate's Court § 207.20). Nevertheless, plaintiff sought and obtained letters of administration of Dorothy's estate from Surrogate's Court, and he successfully petitioned to have his father declared the sole surviving distributee of the estate. Within months, plaintiff's father renounced his entire distributive share and plaintiff, as the estate administrator, deeded the premises at the heart of this litigation to himself.
Over twenty years later, when plaintiff attempted to sell the premises, that was now worth millions of dollars, a title search company discovered Yale's survivorship interest. Plaintiff now asserts that he is entitled to a fee simple absolute ownership in the premises by adverse possession. Plaintiff is wrong that he may extinguish defendant's property claim, given his unlawful lack of diligence in confirming Yale's survivorship interest and failure to correct his error. He cannot benefit from his own mistake at defendant's cost.
Where, as here, cotenants in common are unaware of their respective inheritance interests, and the reason for that mistake is the adverse claimant's failure to perform the requisite diligent search to confirm the status of an apparent distributee, the claimant cannot possess adversely until they take appropriate action to correct the mistake. Thus, the statutory period for adverse possession commences when the claimant informs Surrogate's Court or the distributees of the error. Here, that time began to run once plaintiff informed the trust of Yale's cotenancy interest, when plaintiff allegedly first learned that Yale survived Dorothy. Contrary to the majority view, plaintiff has not held the premises adversely for the entire requisite period and accordingly has failed to establish his claim. Because the majority rewards plaintiff for his failures and sanctions defendant's loss of their interest in the premises, through no fault of their own or that of their predecessors, I dissent.
I.
Dorothy died intestate on February 24, 1992. She was survived by her two brothers, Yale and Zangwill, and under the rules of intestacy they became co-distributees of Dorothy's estate, including as tenants-in-common of the [*6]premises underlying this appeal.[FN8] Approximately two weeks after Dorothy's death, plaintiff, Zangwill's son, petitioned Surrogate's Court to be appointed the Administrator of her estate and have his father declared the sole distributee.[FN9] At the time, plaintiff represented that the sole asset of the estate was cash holdings of $160,000 and that the estate's outstanding debts totaled $8,894. Plaintiff initially filed an affidavit that failed to list the premises as an estate asset, an intentional mistake that he later explained in the underlying litigation was because he "didn't think" it was "that valuable." After the court granted the petition and plaintiff had acquired all assets of the estate through his father, plaintiff eventually filed an Inventory of Assets with Surrogate's Court in October 1992 which listed, in addition to the cash holdings, stocks valued at approximately $6,105 and the premises at $277,000. Although a significant asset under 1992 standards, by plaintiff's own account, by 2020 the premises had increased to a minimum value of $2.3 million.
Plaintiff sought to have his father designated the surviving heir by representing to the court that Yale had predeceased Dorothy. Plaintiff relied on assertions of Zangwill's long-time friend, Harold Kozupsky, a lawyer and the father of plaintiff's lawyer, Roy Kozupsky, in these proceedings. Harold submitted a signed and notarized Surrogate's Court form titled "Family Tree Chart." The form provides blank spaces for responses to certain general genealogical information. On the form, Harold described his relationship and basis for his knowledge of the family tree as follows: "I am a friend of the family" and "I have known decedent's sole distributee, Zangwill Golobe, for over 30 years and thus I am familiar with his family." He asserted that Dorothy had no spouse, children or grandchildren and included the dates her parents predeceased her. For the inquiry regarding "Brothers and Sisters of the decedent," he listed Zangwill and Yale Golobe and, without further elaboration, included the following parenthetical next to Yale's name: "predeceased: 6/85." He also listed plaintiff as Zangwill's only child. At a hearing on the issue, Harold testified that he believed Yale had died six or seven years prior to Dorothy and had no children. Harold provided no factual basis for his bald assertion that Yale died first, nor documentary proof, such as a death certificate, to confirm his belief that Yale died in June 1985. Years later, at a deposition in 2021, Roy stated that he did not recall conducting any investigation before or during the administration of the estate but that his "normal" practice in estate administration matters is to "check probate files, death certificates, yellow pages, Social Security; if warranted and the client could pay for it, an heirship search, if the court required it."
The Court Attorney-Referee determined that "[b]ased upon the testimony and the court file, it appears that [Dorothy] was survived by a sole distributee [sic], her brother Zangwell [sic] Golobe." Surrogate's Court agreed and also granted plaintiff's petition to be administrator on April 7, 1992, fewer than two months after Dorothy's death. By sworn and notarized statement dated September 11, 1992, Zangwill renounced his purported sole distributee's interest in Dorothy's estate, for no consideration. Plaintiff, in his capacity as administrator of the estate, then granted to himself title to the premises by indenture, dated October 27, 1992. Thus, within eight months, plaintiff had acquired Dorothy's entire estate.
Plaintiff asserts that he believed Harold's representations to the Surrogate's Court to be true when he relied on them. That belief proved misplaced because, in fact, Yale outlived Dorothy. He died in January 1993, almost a year after her, and months after plaintiff declared himself fee simple owner of the premises by his own hand. As plaintiff concedes, under the rules of intestacy Yale and Zangwill each acquired an equal one-half interest in the estate and as tenants-in-common in the premises, interests which passed to Yale's successors.
In 2018, when plaintiff sought to sell the property, a title search company discovered that Yale had survived Dorothy and identified his share in the premises. In 2019, plaintiff's attorney notified Yale's successor-in-interest, the Emil Kraus Trust, of the interest and attempted to negotiate an agreement whereby the trustee would agree with plaintiff to sell the premises and delay distribution of the proceeds to a later date. In September 2020, plaintiff retained new counsel and repudiated defendant trustee's purported interest in the premises.
The following month, plaintiff initiated this action to seek a declaration that he is the sole and exclusive owner by adverse possession of the premises "in fee simple absolute, and that the defendant has no proper or valid claim [*7]thereto." Defendant filed an answer and counterclaims seeking: (1) a declaration that defendant is a half owner of Dorothy's estate, including the premises as a co-tenant in common; and (2) equitable relief and monetary damages for plaintiff's alleged fraud and breaches of fiduciary duty to defendant and its predecessors in interest, as tenants in common.
Both parties moved for summary judgment. For his part, plaintiff sought a declaration that he is the sole and exclusive owner of the premises as well as dismissal of defendant's counterclaims. In support, plaintiff submitted an affidavit asserting that he complied with all the elements of adverse possession. He also responded to the counterclaims by asserting that Yale had no contact with his family for many years and that it was his and his family's understanding that he predeceased his aunt, which he claimed was "logical" because he was about ten years older than his aunt, who was 85 years old at the time of her death. Defendant sought summary judgment declaring the trust's cotenancy interest in the estate. Supreme Court granted plaintiff summary judgment based on adverse possession and dismissed the counterclaims as meritless. The Appellate Division affirmed for the same reasons as Supreme Court (212 AD3d 410 [2023]).
I would reverse because plaintiff concedes the cotenancy but failed to establish that he adversely possessed the premises for the required statutory period. Thus, defendant holds a tenancy-in-common to a half interest in the premises. Further, the breach of fiduciary duty counterclaim should be reinstated.
II.
This appeal is at the intersection of the law of real property and trusts and estates, and it requires analysis of acquisition of title under the rules of intestacy and by adverse possession. A close consideration of the letter and spirit of the applicable laws makes clear that plaintiff has failed to establish a right to a fee simple absolute ownership interest in the premises by adverse possession. Thus, defendant's claim to the premises has not been extinguished and must be recognized. Moreover, plaintiff failed to comply with his fiduciary duty to Yale as a distributee of the estate.
A.
Adverse possession has been "called a means of obtaining title by theft" (Jeffry M. Netter, Philip L. Hersch, and William D. Manson, An Economic Analysis of Adverse Possession Statutes, 6 Intl Rev L and Econ 217, 217 [1986]]). Indeed, adverse possession "is exceptional in private law because ownership changes hands without the consent of the erstwhile owners. This practice goes against the general policy in favor of voluntary transactions" (Yun-Chien Chang, Adverse Possession Laws in 203 Jurisdictions: Proposals for Reform, 43 U Pa J Intl L 373, 376 [2022]). The development of adverse possession law in New York reflects a growing desire to cabin title acquisition by adverse possession, making it available only in limited and highly regulated situations, pursuant to RPAPL Article 5. The most recent amendment to our adverse possession law, in 2008, had the stated purpose of annulling case law from this Court believed to "encourage the offensive use of adverse possession" (Senate Introducer's Mem in Support of S.7915-C; see Senate Bill S 364-A2007). As the introducer's memo notes, "[i]f a person desires land, they can buy it" (id.). Moreover, the legislature enacted amendments to RPAPL 522 to ensure that a "reasonably diligent owner was on notice" and protect against adverse possession by stealth or bad faith, thereby increasing the difficulty of acquiring title against a true owner.
The purposes of adverse possession statutes varied and include to "suppress dormant claims, to quiet titles, to require diligence on the part of the owner and penalize those who sit on their rights too long, and to reward the economic activities of a possessor who is utilizing land more efficiently than the true owner is" (Herbert Hovenkamp & Sheldon F. Kurtz, Principles of Property Law 57 [6th ed. 2005]). The doctrine of adverse possession reflects a legislative balancing of the interest of the true owner in retaining their property against the reliance interests of a trespasser. Because a successful claim of title based on adverse possession extinguishes the true owner's claim and recognizes title in the trespasser that is "good against all the world," the adverse possession requirements are narrowly construed and designed so that the owner has an opportunity to protect their interests. A true owner must have actual or constructive notice or have been placed on inquiry notice of the adverse possession. Where the true owner has no opportunity to discover their interests and the trespasser's adverse presence, there is no reason for and justice in the doctrine's application. Put another way, notice—whether actual or by legal fiction—is essential to the doctrine's [*8]rationale of incentivizing owners to maintain their property and rewarding the productive use of land (see Sally Brown Richardson, Abandonment and Adverse Possession, 52 Hous L Rev 1385 [2015)]).[FN10]
B.
As codified in RPAPL article 5, to prevail on an action for title based on adverse possession, the claimant must establish that throughout the applicable statutory period, their possession "has been adverse, under claim of right, open and notorious, continuous, exclusive, and actual" (RPAPL 501 [2]). In line with New York's unwillingness to endow a wrongdoer who has taken possession by disseisin, the claimant must establish their "claim of right" by a "reasonable basis for the belief that the property belongs to the adverse possessor" (RPAPL 501 [3]). The claimant must establish each element by clear and convincing evidence (Estate of Becker v Murtagh, 19 NY3d 75, 81 [2012] [internal citations omitted]). "The character of the possession must be such that it would give the owner a cause of action in ejection against the occupier" (id. at 81). Whether or not the claimant asserts possession under a written instrument, their acts must be "sufficiently open to put a reasonably diligent owner on notice" (RPAPL 512, 522).[FN11]
Unlike situations in which the claimant and true owner have no prior shared interests in the property, tenants-in-common, by virtue of the nature of their interests, have unique rights of possession vis-à-vis one another (id.). Under the common law, "a cotenant's possession is possession by and for the benefit of all other cotenants" (id. at 633, citing Florence v Hopkins, 46 NY 182, 186 [1871]). Thus, "[i]n a tenancy-in-common, each tenant [] has an equal right to possess and enjoy all or any portion of the property as if the sole owner. Consequently, nonpossessory cotenants do not relinquish any of their rights as tenants-in-common when another cotenant assumes exclusive possession of the property" (Myers v Bartholomew, 91 NY2d 630, 632-633 [1998]). The possessory cotenant "is required to show more than mere possession" to lay sole claim to the property (id. at 633). Such acts may be an express communication to exclude cotenants from enjoyment of their rights of ownership, or by openly hostile conduct intended to place the nonpossessory tenant on notice of the cotenant's adverse possession (id.).
RPAPL 541 applies specifically to tenants-in-common, extending the usual 10-year statutory period, thus accounting for the historical difficulty of determining an implied ouster by conduct under this form of co-ownership,
"Where the relation of tenants in common has existed, the occupancy of one tenant, personally or by [their] tenant, is deemed to have been the possession of the other, notwithstanding that the tenant so occupying the premises has acquired another title or has claimed to hold adversely to the other. But this presumption shall cease after the expiration of ten years of continuous exclusive occupancy by such tenant, personally or by [their] tenant, or immediately upon an ouster by one tenant of the other and such occupying tenant may then commence to hold adversely to [their] cotenant"
(RPAPL 541). As the Court has clarified, "absent ouster, the period required by RPAPL 541 is 20 years of continuous exclusive possession before a cotenant may acquire full title by adverse possession" (Myers, 91 NY2d at 632). This measure of "extra protection" from the "inherent danger" of adverse possession attaches to tenants-in-common who each have an "equal right to possess and enjoy all or any portion of the property as if the sole owner," because an "unsuspecting nonpossessory cotenant" would not have "reason even to protest the purportedly adverse possession" (id. at 632-633).
The RPAPL was amended in response to this Court's decision in Walling v Pryzbylo (7 NY3d 228 [2006]), wherein this Court held that the trespasser's knowledge of a true owner's existence was irrelevant to determining whether they had met the elements of adverse possession. The amendment is, in part, intended to prevent such "bad actors" from acquiring title. That purpose in no way diminishes and in fact emphasizes the need for notice so that the nonpossessory tenant has an opportunity to discover the possessory tenant's adverse possession. Logically, if the person lacks any knowledge of a cotenancy interest, the possessory tenant's conduct cannot serve the animating purposes of adverse possession.
As this Court explained over a century ago:
"We are thus led to consider the reason and justice of the rule, which should measure the adverse possession necessary to effect the ouster of a co-tenant. The rule is just if the ouster or adverse possession is brought home to the knowledge of the owner, or is of such definite hostile and public character, that such knowledge may be fairly presumed, but it is unjust and unreasonable if enforced without such limitations. The authorities recognize the reason and justice of such requirement . . . . It must be such that knowledge of its existence is brought home to the co-tenant"
(Culver v Rhodes, 87 NY 348, 353-354 [1882] [internal citations and quotations omitted]).
Just so, because adverse possession seeks to incentivize out-of-possession owners to protect their interests and to ensure that they have actual or constructive notice of the adverse possession or that they have been put on inquiry notice, otherwise they suffer the consequences of losing their property interests (PW Gates, California's Embattled Settlers, 41 Cal Hist Socy Q, 99-130 [1962]; Jennifer Hiatt, Ctr. for Rural Affairs, Adverse to Change: A Modern Look at Adverse Possession [Jan. 2019] ["Adverse possession provides an opportunity for a trespasser to put such land to productive use and potentially claim the land as his own. . . . There is an assumption that an engaged record owner will discover the trespasser and eject him. . . . This, arguably, shifts the burden of loss to the person who will suffer it the least, the person whose roots are less embedded in the land. As such, adverse possession advances two main legal objectives: protecting property rights from those who seek to wrong and encouraging the productive use of land"]; Jeffrey Evans Stake, The Uneasy Case for Adverse Possession, 89 Geo LJ 2419, 2434-35 [2001), available at: https://www.repository.law.indiana.edu/facpub/221 [under adverse possession "those who sleep on their rights, [] lose those rights"]).
C.
New York's law of intestacy and procedures for administering estates are also relevant to the analysis, because plaintiff's possession is a direct result of his conduct in the Surrogate Court proceedings in 1992. Similarly, the duty assumed by plaintiff as administrator of Dorothy's estate is relevant to the merits of defendant's breach of fiduciary claim.
Pursuant to EPTL 4-1.1(a), when a person dies intestate without a surviving spouse, issue, or parent, their estate is distributed to the issue of the parents. In this case, that should have been Dorothy's surviving siblings, Yale and Zangwill. Plaintiff petitioned Surrogate's Court to declare Zangwill the sole distributee, in accordance with EPTL 4-1.1. In such proceeding, Surrogate's Court Procedure Act § 2225 (a) requires, in pertinent part, that:
"[i]f it is established to the satisfaction of the court that a person who would be a distributee, [] has not been heard from for a period of at least three years since the death of the decedent, [] that a diligent search has been made to discover evidence that such person is still living, and that no such evidence has been found, the court may make a determination that such person is presumed dead and that [they] predeceased the decedent without issue"
(SCPA 2225 [a]).[FN12] As noted by the commentaries, "[t]o locate all of the decedent's intestate distributees is not always easy" (Margaret Valentine Turano, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, [*9]2013 Electronic Update, SCPA 2225). The result was a potential escheat to the State "if the missing beneficiaries never showed up" (id.). "To prevent endless delays in the distribution of estates and the languishing of property in the Abandoned Property Fund" the legislature enacted section 2225 (id.). This section "creates a presumption of death in some cases where the distributee is missing, or where the administrator has located some distributees but had not conclusively proved that they are the only ones" (id.). Subparagraph (a) applies "to a known distributee" who "cannot be found within three years after the decedent's death"[FN13] (id.), and "unequivocally requires the administrators to search diligently for all the decedent's distributees" (Margaret Valentine Turano, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, 2020 Electronic Update, SCPA 2225). "The courts factor in the size of the estate when determining the adequacy of the search" (Margaret Valentine Turano, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, 2013 Electronic Update, SCPA 2225).

Section 2017.16 (c) (2) of the Uniform Rules for Surrogate's Court further provides:
"If the petitioner alleges that the decedent was survived by [] only one distributee, [] proof must be submitted to establish:
(1) how each such distributee is related to the decedent; and
(2) that no other persons of the same or a nearer degree of relationship survived the decedent.
Unless otherwise allowed by the court, the proof submitted pursuant to this subdivision must be by an affidavit or testimony of a disinterested person. Unless otherwise allowed by the court, if only one distributee survived the decedent, proof may not be given by the spouse or children of the distributee. The proof shall include as an exhibit a family tree, table or diagram[]."
III.
Here, the original cotenants and their successors were ignorant of their shared interest in the property until 2018, when plaintiff first learned from a title search that Yale did not predecease Dorothy and subsequently advised the trustee of Yale's interest. The reason for this delayed recognition of Yale's interest is plaintiff's utter failure to undertake "a diligent search" to ascertain whether Yale was still alive, as required by Surrogate's Court Procedure Act § 2225. Indeed, he concedes that he made no effort to locate Yale or to find documentary proof of his death. Instead, he assumed that because Yale was older than Dorothy, who was 85 when she died, that Yale must have died first. But the law requires a greater effort to confirm the distributees because life expectancy is never certain. Accordingly, section 2225 contains a three-year window to adequately search for distributees. Plaintiff filed his petition within weeks of Dorothy's death based on his inference and assumptions that Yale died before her. Unlike other and more complicated situations where an inheritance is a distant possibility, Yale was certain to inherit under the rules of intestacy if he survived Dorothy, all the more reason to exercise diligence in confirming Yale's death. Plaintiff must have understood this, given that he petitioned to have the Surrogate's Court declare Zangwill the sole surviving distributee so he could inherit the entire estate. But even if it would not be unreasonable to assume that a person in their nineties who has not been heard from in several years may be dead, it was unreasonable for plaintiff to forego even a minimal effort to confirm such belief. And it would have been as simple a task as searching for a death certificate if indeed Yale was deceased. Nothing exceptional or burdensome about that.
To the extent plaintiff relies on Harold's affidavit and testimony, they were insufficient to satisfy the diligence requirement. Contrary to the majority's conclusion, Harold's assertions did not comply with regulation 207.16—nor [*10]for that matter section 2225—and were not a sufficient basis to support the Surrogate Court's holding as a matter of law in this adverse possession litigation (see majority op at 7-8).
Harold's submissions were not based on personal knowledge that Yale died before Dorothy. He merely stated he was a close family friend, and he did not explain the factual basis for his assertion that Yale died six or seven years before Dorothy. In that vein, the analysis of the Appellate Division, Second Department in Partenfelder v People is instructive. The court there explained that submissions to establish death of a distributee were inadequate because "[t]here is no suggestion as to the sources of his information, the grounds of his belief, nor any fact from which a court could determine that each of the persons above named was not at the present time living, residents of this city and within the jurisdiction of this court" (157 AD 462, 471 [2nd Dept 1913]). In Sherman v People, the Third Department similarly discounted inadequate submissions, where "the affidavits [there] presented mere conclusions on the part of the affiants and [were] wholely insufficient to establish, as a fact, that [decedent] died without leaving heirs at law" (169 AD 17, 19 [3rd Dept 1915]). Partenfelder aptly noted that "[t]here is a distinction between a case where there is some evidence upon which the court may act, although as to the weight and sufficiency of it minds may differ, and a case where there is absolutely no evidence upon which to base judicial determination" (157 AD at 471).
In a First Department case, the family tree affidavit suggested, on its face, a lack of first-hand knowledge of critical facts, was found to be insufficient:
"The only evidence they offered was a family tree affidavit executed by their counsel, who claims to have also been decedent's counsel and to have known her for five years prior to her death. The circumstances show, however, that petitioners' counsel apparently did not have personal knowledge of decedent's maternal or paternal first cousins, and only received such information from interested parties (see 22 NYCRR 207.16[b] [2], [c]). Moreover, the family tree affidavit contained critical omissions regarding the dates of death of three paternal aunts and uncles, and listed someone as a paternal first cousin who, in later documentation submitted by petitioners, was shown not to be such. Accordingly, the family tree affidavit, standing alone, was insufficient to support petitioners' claim" (In re Jordan, 52 AD3d 328, 330 [1st Dept 2008] [emphases added]).
Similarly, the family tree form submitted by Harold was insufficient to support plaintiff's petition. The form stated that he had known the family but not any particular information regarding his relationship to Yale and it contained no basis information for Harold's assertion that Yale died "6/85".
As the statutory provisions make clear, adequate documentary and first-hand testimonial evidence is necessary to establish the status of known and unknown distributees. Ironically, plaintiff's counsel in the Surrogate Court proceedings admitted in the litigation below that he usually conducted a search for documentary proof, such as a death certificate and social security certifications, but he could not say that any such effort was undertaken here. Instead, plaintiff relied primarily on an assumption. But because, as was true here, a presumption of death based on age may be wrong the law requires diligent effort, to confirm what is nothing more than supposition. The circumstances here are particularly troubling because although the court could measure the adequacy of the petition against the estate's worth, plaintiff here dramatically undervalued Dorothy's estate and did not even include the premises, which he only disclosed after the court named Zangwill as the sole distributee, and after he renounced his interest. Those actions left the whole of the estate to plaintiff, who then immediately transferred the premises to himself.
In short, plaintiff cannot extinguish defendant's ownership interest based, in part, on an erroneous representation to the Surrogate's Court and plaintiff's lack of adequate effort to locate Yale or confirm that Yale predeceased Dorothy.
Further, mutual mistake as the source of a claim of right for adverse possession purposes cannot be the basis for vesting fee simple absolute title in a tenant-in-common in circumstances where the mistake was a result of the adverse possessor's own conduct or inaction that deprived the cotenant of the legally required notification of their [*11]interest.[FN14] Indeed, as other state courts have recognized "[t]here can be no adverse holding against a co-tenant who does not know that [they] ha[ve] an interest in the land" (Moore v Gaines, 308 Ky 223, 232 [1948]). The uninformed cotenant does not know that they have a property interest to maintain and no reason to actively investigate or warn trespassers and thus no occasion to take legal action against one who seeks to obtain title by adverse possession. Here, I would limit the rule to plaintiff's conduct as administrator, because the mistake as to who holds an interest in the premises originates from plaintiff's failure to adequately search for and confirm the date of his uncle Yale's death. "The power to register a title, which may be conclusive against absent heirs or others having interests in the property, should not be permitted to do away with the usual precautions to give notice to such heirs" (Belmont Powell Holding Co. v Serial Building Loan & Savings Inst., 167 AD 124, 125 [2nd Dept 1915]).
The cotenant should either know they have an interest through intestacy or should have an opportunity to discover as much with appropriate diligence. That is not the case where the notice required by law is not provided to the distributee cotenant because the claimant failed to adequately search for confirmation that the distributee predeceased the decedent. The adverse possession statutory period should commence when the claimant corrects the mistaken assumption that a presumptive heir predeceased the decedent. That can be accomplished by informing the court or the distributee. Once the clock starts to run, the claimant can seek to adversely possess the property for the next 20 years. Here, plaintiff informed defendant of its tenancy-in-common interest less than 20 years before filing this action for title by adverse possession. As such, his claim fails and defendant's cause of action for ejection has not expired. Since defendant filed a timely claim for title to the premises, defendant should be declared a cotenant in common with plaintiff.
With respect to defendant's counterclaims, I would hold that the fraud claim was properly dismissed for a failure to raise a triable issue of fraudulent intent but that the breach of fiduciary duty claim should not have been dismissed because plaintiff was required to properly search for Yale in accordance with the law. That counterclaim should be reinstated.
IV.
As a final note, denial of plaintiff's adverse possession claim here promotes the intended goals of the RPTL, EPTL and the Surrogate's Court Act in cases involving tenants by the entirety and intestacy. The statutes seek to ensure that all parties with a potential property interest are identified and contacted within a reasonable period from the death of the decedent (see e.g. SCPA 2225). The burden of establishing that legally adequate efforts have been made to inform both the court and the potential distributees is on the party seeking to administer the estate (id., EPTL 4-1.1[a]; SCPA 2225). Where the administrator benefits from a mistaken finding by Surrogate's Court based on their inadequate submissions, and then seeks to acquire fee simple absolute title as a result of that error by adverse possession, their claim for title fails. This approach serves multiple social goals. It protects the nonpossessory cotenant who has not been identified and notified of their inheritance in accordance with the law but who is at risk from disseisin by the blameworthy cotenant. The rule would require that cotenants—like any other true owner—are placed on actual, constructive or inquiry notice of their interests. Once so informed, they are incentivized to act against a cotenant's hostile possession or risk the loss of their interest. And, the rule promotes diligent efforts to identify potential heirs to avoid future litigation.
Denial of adverse possession here is fair and just based on the very specific set of facts presented in this appeal. First, the mistake was discovered in 2018, only 26 years after Dorothy died, a short time frame, and close to the 20-year time applicable to cotenants adopted by the legislature (see RPL § 241). Second, the consequences of the error fall on the shoulders of the person who had the duty and opportunity to avoid the mistake—plaintiff—rather than the uncle's successors, who it is undisputed in no way contributed to the initial error or its delayed discovery. Third, the result ensures that the cotenants maintain the interest in Dorothy's real property to which they are entitled by our rules of intestacy and estate distribution, subject to a proper accounting rather than a mistake as to surviving heirship. Fourth, because the law already prohibits acquisition of title by fraudulent conduct denial here creates no greater uncertainty in title, and perhaps less because of the limited time frame involved (26 years) and the fact that the [*12]adverse possessor is also the son of the original cotenant (see Yin Wu v Wu, 288 AD2d 104, 105 [2001] ["A forged deed is void and conveys no title"]; RPL § 266). Fifth, due to plaintiff's conduct, Yale and his successors-in-interest had no opportunity to timely challenge Surrogate Court's determination in 1992 that Yale predeceased Dorothy.
The rule adopted by the majority undermines the purposes of adverse possession and the rules of intestacy. It does nothing to incentivize true owners to protect their rights. It is now for the legislature to act, as it has in the past, if it disagrees with the majority and does not intend for this "disfavored" doctrine to extinguish cotenant interests under the circumstances presented here.
Order affirmed, with costs. Opinion by Chief Judge Wilson. Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
Decided March 20, 2025

Footnotes

Footnote 1: For ease of comprehension, all references to Mr. Golobe in this opinion are references to John Golobe, the plaintiff.

Footnote 2: The dissent relies on SCPA § 2225 [a] to conclude that Mr. Golobe's search was insufficient (dissenting op at 16). Although we have not determined the circumstances in which that provision applies and have no cause to do so here, the text may apply only where a distributee is missing but not known to be dead. The regulations, now codified at 22 NYCRR 207.16, appear to establish the requirements for showing that potential distributee is known to be dead.
Footnote 3: The dissent argues that Mr. Kozupsky's testimony was insufficiently detailed to fulfill the regulatory requirements (dissenting op at 17). But Surrogate's Court accepted Mr. Kozupsky's testimony as proof that Zangwill Golobe was Dorothy Golobe's sole surviving heir. Even absent any opposition, the Court was obligated to evaluate the sufficiency of Mr. Kozupsky's testimony and affidavit, did so, and entered a decision. That decision is not before us. We hold only that the fact that Mr. Golobe followed the procedure set out in the regulations supports our conclusion that he did not breach his fiduciary duty. 

Footnote 4: Civil Practice Act § 41-a initially established a 15-year presumption period. When the provision was recodified as RPAPL 541, the period was reduced to 10 years (Myers, 91 NY2d at 636).

Footnote 5: The Trust urges us to adopt the reasoning of the Supreme Court of Montana, which has held that a cotenant may adversely possess against another cotenant only through ouster (see YA Bar Livestock Co. v Harkness, 269 Mont 239, 244-245, 887 P2d 1211, 1214 [1994]). That reasoning is inapplicable here because RPAPL 541 creates a path to adverse possession even in the absence of express ouster.
Footnote 6: The Trust relies on Trevisano v Giordano, an Appellate Division case, for the proposition that "the expiration of the 10-year [RPAPL 541] period merely triggers the possibility of adverse possession; it does not establish it" (202 AD2d 1071, 1071 [4th Dept 1994]). That proposition is true for two reasons. First, the period required to acquire sole ownership is 20 years: the 10-year RPAPL 541 period plus 10 more (see Myers v Bartholomew, 91 NY2d at 635). And second, the other requirements of adverse possession continue to apply. But after the 10-year RPAPL 541 period expires, a cotenant may show hostility through the same conduct as a claimant operating without a co-tenancy. To the extent Trevisano suggested that express ouster would be required even after expiration of the additional ten-year period prescribed by RPAPL 541, that suggestion is incorrect.

Footnote 7: For the reasons discussed above, we hold that the Trust has failed to demonstrate that Mr. Golobe breached his fiduciary duty or acted fraudulently. We therefore do not reach the question of whether breach of fiduciary duty or fraud would negate Mr. Golobe's claim of right.

Footnote 8: The premises is a three-story mixed-use building on the westside of Manhattan, New York.

Footnote 9: By sworn and notarized statement dated March 11, 1992, Zangwill renounced all his rights to letters of administration upon his sister Dorothy's estate and consented to the court granting such letters to plaintiff, his son.

Footnote 10: The majority intimates that I would impose an actual notice requirement on co-tenancies (majority op at 14). Clearly that is not the case, as I emphasize, the notice necessary to start the adverse possession clock is actual, constructive, or inquiry (see infra 19-20). The majority further asserts that any unfairness of the outcome is mitigated by the 20-year time period (see majority op at 15-16). Because co-owner was never notified of his ownership interest, the unfairness is obvious. Indeed, the majority's position assumes the co-owner could, if given enough time, discover his interest in the property. Plaintiff's conduct here made that impossible.

Footnote 11: It is unclear whether plaintiff asserts adverse possession without a written instrument or under the administrator's deed by which he transferred the premises to himself. Regardless, in either case the RPAPL requires possessory conduct that would place the true owner on notice.

Footnote 12: To the extent the majority suggests the regulations are at odd with this statute, the statute supersedes the regulations (see majority op 8 n 2).

Footnote 13: Subparagraph (b) applies to classes of distributees and requires "diligent and exhaustive efforts have been made from all available sources to ascertain the existence of distributees" and that "at least three years have elapsed since the death of the decedent."

Footnote 14: Unlike the majority, I see no reason to adopt a sweeping rule that mutual mistake never prevents adverse possession by a cotenant. As I explain, I would resolve this appeal based on plaintiff's conduct as the estate administrator and the impact of his actions on the commencement of the 20-year adverse possession statutory period, which has not yet expired.